IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 1, 2010 Session

IN RE BETTY P., ET AL.

Appeal from the Juvenile Court for Johnson City
No. 35,240-35,244    Sharon M. Green, Judge

No. E2010-00318-COA-R3-PT - FILED SEPTEMBER 28, 2010

This is a termination of parental rights case.  Macaria L. ("Mother") appeals from the order terminating her parental rights to her five minor children and awarding full guardianship to the State of Tennessee.  At the conclusion of a bench trial, the court ordered Mother's parental rights terminated upon its finding that she had abandoned her children by willfully failing to pay child support.  Mother appeals.  We conclude that the record contains clear and convincing evidence supporting the termination of Mother's rights.  Accordingly, we affirm.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded

CHARLES D. SUSANO., JR., J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Aaron J. Chapman, Johnson City, Tennessee, for the appellant,  Macaria. L.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; and Dianne Stamey Dycus, Office of the Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

Mother and Jose P.[1] ("Father") were never married. They are the parents of five minor children: Betty P. (DOB: 8/24/1995), Diana P.-L. (DOB: 9/6/96), Karen P.-L. (DOB: 2/2/1999), Pedro P.-L. (DOB: 11/15/2001), and Cesar Angel P.-L. (DOB: 3/24/2004) (collectively "the Children"). The Children first came to the attention of the Department of Children's Services ("DCS") after petitions for truancy were filed for the three oldest. Those three were adjudicated dependent and neglected because of the unlawful action of their parents in keeping them out of school. Subsequently, in February 2007, DCS filed a dependency and neglect petition as to all of the Children. The petition alleged that Mother and Father were unable to properly care for them and that the Children were at risk of substantial harm and neglect. The petition noted that Mother and Father were having difficulty meeting the Children's basic needs, and that the family had been evicted from their home and were living in a relative's apartment with up to ten other people. Furthermore, they had received assistance from DCS with rent, living expenses, and food, but had exhausted their access to community resources. In addition, the Children's basic personal hygiene and medical care needs were not being met by Mother and Father. The Children were ordered into protective custody and placed in foster care.

On April 7, 2007, the court found the Children to be dependent and neglected as alleged, placed them in the care and custody of DCS, and ratified permanency plans developed for each of them. In the following month, the parents were found to have made substantial progress on the permanency plans and the Children were allowed to return to their parents' apartment on a trial basis. At the end of August, Mother and Father stipulated to the termination of the trial home visit and the court ordered it revoked upon a finding that the Children were not being properly supervised, the home was unsanitary, unrelated adult males were constantly in the home, and the Children were being neglected.

On six occasions between November 2007 and March 2009, DCS developed a new permanency plan, one for each of the Children. The original plan[2] approved on March 20, 2007, had reunification with the parents as the only goal. In the revised plans, the initial requirements and responsibilities for Mother remained, and some new responsibilities were added. Generally, the plans required Mother to meet the Children's medical and educational needs; obtain and maintain appropriate – safe and sanitary – housing; develop budgeting; develop parenting skills; gain education concerning food handling and nutrition; obtain a

---

[1] The record reflects that Mr. P. is also known as "Pedro P. S."

[2] Although a separate plan was developed for each child, the plans shared the same objectives, requirements and essential terms.

legal source of income sufficient to support the Children; and properly supervise the Children, with a particular focus on not allowing them to have relationships with males more than two years older than them. Beginning with the March 4, 2008, plan, Mother was required to begin paying monthly child support of $100 (the total amount for all five Children) retroactive to February 5, 2008. At that time, reunification and adoption became the plans' dual goals. In addition, Mother was required to undergo a psychological evaluation and to complete a parenting assessment and follow its recommendations. The final plan changed the sole permanency goal to adoption.

DCS petitioned to terminate the parents' parental rights on November 5, 2008. As to Mother, four grounds were alleged: abandonment by non-support, severe child abuse, substantial non-compliance with the permanency plans, and the persistence of conditions preventing the Children's return to her custody. Evidentiary hearings on the petition were held over six days between July 7, 2009 and December 4, 2009. At the time, the Children had been in various foster care homes for over two years except during the period of the unsuccessful trial home visit. For her part, Mother had left Father and married her boyfriend on December 29, 2008. At the conclusion of the hearing, the court terminated the parental rights of Mother and Father.[3] As to Mother, the court found that she had substantially complied with her responsibilities under the permanency plans and had maintained a home for the past six months. However, the home was a two-bedroom apartment that could not adequately house her seven-person family. While the trial court concluded that Mother had not made substantial improvements in her life such as to make it safe or in the Children's best interest to return to her home, the court terminated Mother's rights on only one of the alleged grounds – abandonment of the Children by Mother's failure to pay child support. The court concluded that this ground was established by clear and convincing evidence. In its bench ruling, the trial court stated:

> The Court finds that there is clear and convincing evidence of abandonment by willful failure to pay child support during the four consecutive months immediately preceding the filing of the petition in this case.
>
> The Court had previously made findings as far as [M]other's work history. She was employed from November of '07 to May of '08 at Chuckey Cheese. She testified that her illegal alien status resulted in her firing. She then obtained work in June of '08 and worked through part of August '08 at McDonald's and a laundromat and . . . the Laundromat job is the job she quit

---

[3]Father did not appeal the termination order.

because the cat hairs made her sick. She testified that she was aware of the need for her to work. Was aware that if she did not pay child support her parental rights could be terminated, and that she knew that the child support was supposed to be $100.00 a month.

Ms. Noe[4] testified that she and [Mother] continually talked of the importance of her getting a job, that Ms. Noe helped her fill out job applications and Ms. Noe arranged for an interview of mom at CiCi's although [Mother] did not go to that interview.

The Court finds that although it would be more difficult for her to . . . maintain stable employment due to her language barrier and her lower intellectual functioning that she has had jobs. She is working now as far as the Court knows and she is able to contribute to the support of the [C]hildren. And according to her testimony during May, June, July and August ['08] she was working . . . .

Mother filed a timely notice of appeal.

## II.

Mother raises one issue for our review:

Whether the trial court erred in finding that the abandonment by willful failure to support ground was proven by clear and convincing evidence.

## III.

The Supreme Court has opined as to the standard of review for cases involving the termination of parental rights:

[T]his Court's duty. . . . is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

---

[4]Ms. Noe testified that she was employed as a family preservation specialist by Options for Families in Need to provide in-home assistance and translation services.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. *Id*.; Tenn. R. App. P. 13(d). In weighing the preponderance of the evidence, great weight is accorded to the trial court's determinations of witness credibility, which shall not be reversed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed *de novo* with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995) (*rev'd on other grounds*, *In re Swanson*, 2 S.W.3d 180 (Tenn. 1999)); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting T.C.A. § 36-1-113(l)(1)). "Few consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. Tenn. Code Ann. § 36-1-113 (Supp. 2007) governs termination of parental rights in this state. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interests of the child." Tenn. Code Ann. § 36-1-113(c); *In re F.R.R., III*, 193 S.W.3d at 530. Both of these elements must be established by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable,

***State v. Demarr***, No. M2002-02603-COA-R3-JV, 2003 Tenn. App. LEXIS 569, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed August 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. ***In re Valentine***, 79 S.W.3d at 546; ***In re S.M.***, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); ***In re J.J.C.***, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. ***In re A.D.A.***, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); ***Ray v. Ray***, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); ***In re C.W.W.***, 37 S.W.3d at 474.

IV.

Mother challenges the trial court's finding that the statutory ground of abandonment of the Children by non–support was established by clear and convincing evidence. She contends that the evidence showed that her admitted failure to make the required child support payments was not willful and therefore cannot be relied upon to terminate her parental rights.

The trial court terminated Mother's rights pursuant to Tenn. Code Ann. § 36-1-113 (g)(1)(Supp. 2009). The statute provides, in relevant part, as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection.
> . . .
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

In turn, code section 36-1-102(Supp. 2009), referenced above, provides for the termination of parental rights on the ground of abandonment as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully

-6-

failed to make reasonable payments toward the support of the child. . . .

Under the preceding subsection of Section 36-1-102, " 'willfully failed to support' or 'willfully failed to make reasonable payments toward such child's support' means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D).

In the present case, the relevant four-month period concerning the payment of child support is the four months from July 5 to November 5, 2008, the date DCS filed the petition. In its January 20, 2010, termination order, the trial court found that Mother wholly and willfully failed to meet her child support obligation during this four-month period as follows:

> The Court finds from the testimony of the witnesses, the exhibits entered into evidence and the record as a whole that DCS had proven, by clear and convincing evidence, that [Mother] has abandoned the [C]hildren by willful failure to pay child support during the four consecutive months immediately preceding the filing of the Petition to Terminate Parental Rights. The evidence showed that [Mother] was ordered to pay child support in March 2008. The evidence further showed that she made $100.00 child support payments in March and April, 2008. The Court found that she was employed until May 2008, obtained and maintained employment from June through August, 2008, whereupon she lost her employment. No child support was paid after April, 2008. There was further evidence, presented by [Mother] by receipts made out to her that between March, 2008 and November, 2008 she paid well over $1,000.00 for the purchase of an automobile. There was no evidence of payment of child support by [Mother] during the four consecutive months immediately preceding the filing of the Petition to Terminate Parental Rights . . . . The Court finds and so holds that [Mother's] failure to pay child support was willful.

The evidence does not preponderate against the trial court's findings. Mother acknowledged that she failed to pay child support as ordered, aside from two payments she made in March and April, 2008, *i.e.*, before the relevant four-month period began. She contends that her failure to pay was not willful, because she was subsequently unemployed

or between jobs and had no other financial resources to continue making payments. As to the latter contention, we believe the evidence clearly shows otherwise.

With regard to the concept of willfulness in termination of parental rights cases, this Court has observed:

> The statutory requirement that the failure to visit or to support must be willful is constitutionally mandated, and intent is a necessary element of abandonment. Thus, if the failure to support or visit cannot be proved to be intentional or willful, then abandonment has not been shown.
>
> The concept of willfulness or intent is often the determining factor in whether the existence of that ground has been shown by clear and convincing evidence.
>
> The question of intent or willfulness is fact specific and depends on the totality of circumstances. Failure to provide support is willful if the parent is aware of his or her duty to support, is capable of paying support, makes no attempt to provide support, and has no justifiable excuse. Willful conduct is intentional or voluntary; often, intent must be inferred from circumstantial evidence. Willfulness is a question of fact that the trial court is in the best position to make.

*In re W.B.*, Nos. M2004-00999-COA-R3-PT and M2004-01572-COA-R3-PT, 2005 WL 1021618 at *8-9 (Tenn. Ct. App. M.S., filed April 29, 2005) (internal citations omitted).

As the trial court correctly found, Mother was employed from November 2007 - May 2008, when she was terminated as a result of her illegal alien status. From June to August 2008, Mother was employed at a laundromat and at a McDonald's. According to Mother, she left the laundromat because she became sick due to an allergic reaction to cat hair in the clothing. Although Mother said she sought medical treatment, she was soon fired from McDonald's due to her absences from work after she failed to provide a doctor's excuse for her absence. By near the end of 2007, Mother had left Father. She began dating and eventually lived together with her 22-year-old boyfriend, Mr. Cesar A. The couple got an apartment and were married in December 2008. This fact, however, had not yet been made known to the Children at the time of the termination hearing some 10 months later. Around June 2008, Mother and her then-boyfriend, Mr. A., purchased a car that cost over $3,000 with an initial $400 down payment. Receipts introduced at trial reflect that all of the payments

made from June - November 2008, totaling over $1,000, were made by Mother[5] in cash and the car was paid in full. During the relevant four-month period, in which she paid no child support, Mother was credited with the payment of $923 toward the car purchase. At trial, Mother was questioned regarding the purchase of the car as follows:

> Q: Did you tell us earlier that you paid a little better than $3,000.00 for your car?
>
> A: No, it wasn't all at once. Yes, I did, but it wasn't all at once.
>
> *   *   *
>
> Q: You bought it at the end of last summer?
>
> A: Well, yes, but we didn't pay for it all at once. We just paid for it, you know, the way you pay for things.
>
> Q: How long before it was paid off?
>
> A: I have the receipts, but I don't remember. I don't remember when it was paid off.
>
> *   *   *
>
> Q: Okay. These were all paid by you.
>
> A: Well, I took it out in my name, *but we both paid for it.*
>
> *   *   *
>
> Q: All right. Six of the seven payments were made in [the four months from July 5 - November 5, 2008]. Those six payments I'm calculating at $923.00. Could you explain how you could pay $923.00 for a car and not manage to pay $400.00 or anything at all for the support of your children?
>
> A: Well, the thing is I paid it. The thing is that he paid those and I didn't have work at that time.

---

[5]The receipts were made out to her name.

Q: All those receipts are in your name.

A: You know if you can't get a car here you cannot get to work and you cannot get around. If you don't have a car, you have to be asking for a ride. He was paying for it *mostly*, even though it was in my name.

(Emphasis added.)

As we have noted, the evidence showed that Mother was working in July and August 2008, before she quit one job and was terminated from another. At trial, Mother provided nothing to substantiate that she became ill as a result of her work. Furthermore, Ms. Noe, her in-home services provider and translator, testified that Mother never reported that she was too ill to work and that Mother attended all of her in-home visits from August through November and appeared normal. Athough she testified she was looking for another job, Mother did not attend a job interview Ms. Noe arranged and did not testify to any particular jobs she sought in the ensuing months from August 2008 until May 2009 when she became employed at a hotel. At the time of the hearing, she continued to hold that job.

We are not unmindful, as the court also recognized, that Mother's status as an illegal immigrant, her inability to speak English, and her lower level of intellectual functioning, undoubtedly made it difficult for her to find and keep a job. These difficulties notwithstanding, Mother repeatedly found work. In short, during the four-month period with which we are concerned, Mother worked for two months and had access to other monies in the other months. Mother's argument that the money she paid on the car was not "hers" is unconvincing, even irrelevant in our view. The fact remains that while her Children remained in foster care, and during a time when Mother was fully aware that she was at risk of losing them if she did not help support them, Mother made the choice, over and over again, to take cash in hand and apply all of it toward a car and none of it toward the Children. The evidence preponderates overwhelmingly in support of the trial court's finding that Mother abandoned the Children by her willful failure to support them.

V.

Having concluded that the statutory ground of abandonment was clearly and convincingly established, we must turn now to the issue of whether clear and convincing evidence supports the trial court's conclusion that termination of Mother's rights is in the best

interest of the Children.[6]  To this end, Tenn. Code Ann. § 36-1-113(i) provides a non-exclusive list of applicable factors as follows:

> (i)    In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian

---

[6]While this issue is not raised by Mother, we still elect to consider it.

consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As this court has observed, the determination of best interest should be considered from the perspective of the child and not the parent. *In re Giorgianna H.*, 205 S.W.3d 508, 523 (Tenn. Ct. App. 2006) (citations omitted).

With respect to Mother, the trial court essentially concluded that termination was in the Children's best interest because "she has not made sufficient improvement in her life that it would be safe or in the [C]hildren's best interests to return to her home." In particular, the court observed:

> Although [Mother] has presented herself as having made a recent life change, which she credits to her association with a church and support group, her residence is not suitable for the [C]hildren to reside in, she has just recently begun to have appropriate interactions with the [C]hildren although they have been in foster care for over two years, the younger boys cannot communicate with [Mother] because she cannot speak English and they cannot speak Spanish; the parenting assessment showed that she was not able to successfully parent five (5) children.

Returning to Mother's failure to pay child support, the trial court further found that this was also relevant to its consideration of the best interest of the Children. Specifically, the court noted that Mother, "[d]espite the fact that she has been gainfully employed since May, 2009, and during at least two of the four months prior to the filing of the Petition, . . . has made no additional payments of child support. . . ." At trial, Mother offered no real explanation for her failure to resume paying child support since she had found a steady job, stating only that she "can't pay now because they cancelled [court]," presumably referring to the several times the termination hearing was continued.

The evidence does not preponderate against the trial court's findings in support of its best-interest conclusion.  Moreover, at trial, the court heard from the Children's current foster parent, Ms. Julia P., who had custody of the Children for two months and was considering adopting all of them.  Ms. P. was trained to provide therapeutic foster care, was familiar with the Children's special educational needs, and had been working with them daily to understand their assignments.  The Children were living only with Ms. P., whose own children were grown, in a suitable home with adequate sleeping and living space, and had shown improvement in their school work.  They were affectionate towards Ms. P. and enjoyed spending time with her extended family during visits every other weekend.  Based on the foregoing, we concur in the trial court's finding that there is clear and convincing evidence showing that the termination of Mother's parental rights is in the best interest of the Children.

## VI.

Lastly, the State has presented additional argument in which it challenges the trial court's findings that the other alleged grounds for termination of Mother's rights – substantial noncompliance with the permanency plans and persistent conditions – were not proven by clear and convincing evidence.  In view of our determination that the ground of abandonment by non-support was properly and sufficiently established and that termination is in the best interest of the Children, we decline to consider the trial court's disposition of the alternative grounds alleged in the petition.  The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights.  *In re C.W.W.*, 37 S.W.3d at 473 (*abrogated on other grounds*, *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005)).

## VII.

The judgment of the trial court is affirmed.  Costs on appeal are taxed to the appellant, Macaria L.  This case is remanded to the trial court, pursuant to applicable law, for enforcement of the court's judgment and for the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE